UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ROGER ANCALADE** | **CIVIL ACTION** |
| **VERSUS** | **NO. 19-11571** |
| **ROBERT TANNER, WARDEN** | **SECTION: "A"(1)** |

# REPORT AND RECOMMENDATION

Petitioner, Roger Ancalade, a Louisiana state prisoner, filed this federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On November 14, 2013, petitioner was convicted of illegal use of a weapon under Louisiana law.[1] On December 18, 2013, he was sentenced to fifteen years in prison without benefit of probation, parole, or suspension of sentence.[2] The Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence on January 14, 2015.[3] The Louisiana Supreme Court denied his related writ application on January 8, 2016,[4] and the United States Supreme Court then denied his petition for a writ of certiorari on June 13, 2016.[5]

---

[1] State Rec., Vol. 3 of 5, transcript of November 14, 2013, p. 237; State Rec., Vol. 1 of 5, minute entry dated November 14, 2013; State Rec., Vol. 2 of 5, jury verdict form.
[2] State Rec., Vol. 3 of 5, transcript of December 18, 2013; State Rec., Vol. 1 of 5, minute entry dated December 18, 2013.
[3] State v. Ancalade, 158 So. 3d 891 (La. App. 4th Cir. 2015); State Rec., Vol. 3 of 5.
[4] State ex rel. Ancalade v. State, 184 So. 3d 691 (La. 2016); State Rec., Vol. 5 of 5.
[5] Ancalade v. Louisiana, 136 S. Ct. 2467 (2016); State Rec., Vol. 3 of 5.

On March 21, 2017, petitioner filed an application for post-conviction relief with the state district court.[6] That application was denied on May 25, 2017.[7] His related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal on August 25, 2017,[8] and the Louisiana Supreme Court on November 14, 2018.[9]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief on July 2, 2019.[10] The state filed a response arguing that the application should be dismissed as untimely,[11] and petitioner filed a reply to that response.[12]

"The statute of limitations for bringing a federal habeas petition challenging a state conviction begins to run on 'the date on which the [state] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" Butler v. Cain, 533 F.3d 314, 317 (5th Cir. 2008) (quoting 28 U.S.C. § 2244(d)(1)(A)).[13] Where, as here, a petitioner pursued direct review all the way through the United States Supreme Court, his state criminal judgment became final for AEDPA purposes on the date that court denied relief. See, e.g., San Martin v. McNeil, 633 F.3d 1257, 1266 (11th Cir. 2011) ("[D]irect review of a state judgment of conviction concludes on the date of the [United States] Supreme Court's denial of a petition for writ of certiorari."); Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001) ("'[D]irect review,' as used in Section 2244(d)(1)(A), includes direct review by the United States Supreme Court via writ

---

[6] State Rec., Vol. 1 of 5.
[7] State Rec., Vol. 4 of 5, Judgment dated May 25, 2017.
[8] State v. Ancalade, No. 2017-K-0629 (La. App. 4th Cir. Aug. 25, 2017); State Rec., Vol. 4 of 5.
[9] State ex rel. Ancalade v. State, 256 So. 3d 268 (La. 2018); State Rec., Vol. 5 of 5.
[10] Rec. Doc. 1.
[11] Rec. Doc. 13.
[12] Rec. Doc. 14.
[13] Although 28 U.S.C. § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

of certiorari, and … the limitations period for state prisoners therefore begins to run only after the denial of certiorari or the expiration of time for seeking certiorari."); Kapral v. United States, 166 F.3d 565, 575 (9th Cir. 1999) ("While the term 'direct review' is not defined in § 2244(d)(1)(A), it is axiomatic that direct review of a state court criminal judgment includes the right to seek certiorari review in the United States Supreme Court.  Therefore, a state court criminal judgment is 'final' (for purposes of collateral attack) at the conclusion of review in the United States Supreme Court or when the time for seeking certiorari review expires." (citations omitted)); Lash v. Rednour, 719 F. Supp. 2d 1014, 1018 (C.D. Ill. 2010); Calvin v. McDaniels, 635 F. Supp. 2d 1197, 1203 (D. Nev. 2009); Brian R. Means, Federal Habeas Manual § 9A:16 (2020) ("If the state … prisoner files a timely petition for certiorari, the judgment becomes final for statute of limitations purposes under § 2244(d)(1)(A) … on the date that the United States Supreme Court either denies the petition for certiorari or issues a merits decision.").[14]

Accordingly, petitioner's state criminal judgment became final for AEDPA purposes – and his federal limitations period therefore commenced – on June 13, 2016, when the United States Supreme Court denied his direct-review petition for a writ of certiorari.  His AEDPA limitations period then expired one year later, unless that deadline was extended through tolling.

Regarding the statute of limitations, the AEDPA expressly provides:  "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).

---

[14] In his response, petitioner suggests that his conviction did not become final until ninety days *after* the United States Supreme Court's ruling. See Rec. Doc. 14, p. 2.  As noted herein, that is incorrect.

3

After two hundred eighty (280) days of petitioner's one-year period elapsed, he tolled the limitations period by filing a post-conviction application with the state district court on March 21, 2017.[15] Although that application was denied by the district court, it nevertheless remained "pending" for § 2244(d)(2) purposes for the duration of the post-conviction proceedings, so long as petitioner continued to seek review at the higher levels of the state court system in a timely manner. Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-71 (5th Cir. 2004). Here, the state does not argue that petitioner's related writ applications were untimely filed.[16] Accordingly, the undersigned finds that tolling continued until the Louisiana Supreme Court denied post-conviction relief on November 14, 2018.[17]

Once the limitations period resumed running at that point, petitioner had only eighty-five (85) days remaining. Accordingly, he had only until **February 7, 2019**, either to again toll the limitations period or to file his federal application.

Petitioner had no other applications pending before the state courts at any time on or before February 7, 2019. Therefore, he clearly is not entitled to further statutory tolling.

---

[15] Federal habeas courts apply Louisiana's "mailbox rule" when determining the filing date of a Louisiana state court filing by a *pro se* prisoner, and therefore such a document is considered "filed" as of the moment the prisoner "placed it in the prison mail system." Causey v. Cain, 450 F.3d 601, 607 (5th Cir. 2006). Because that date cannot be gleaned from the state court record in this instance, the Court has simply used the signature date of the application as the filing date, in that the application was obviously placed in the mail no earlier than the date it was signed. See United States v. Minor, 582 F. App'x 315, 316 (5th Cir. 2014); Estes v. Boutté, Civ. Action No. 19-2289, 2020 WL 1990823, at *2 (E.D. La. Mar. 6, 2020), adopted, 2020 WL 1984331 (E.D. La. Apr. 27, 2020); Crochet v. Goodwin, Civ. Action No. 13-3106, 2014 WL 5093995, at *2 n.10 (E.D. La. Oct. 8, 2014); Thornton v. Terrell, Civ. Action No. 09-1631, 2009 WL 4855743, at *1 n.1 (E.D. La. Dec. 4, 2009).

[16] See Rec. Doc. 13, p. 5.

[17] The limitations period resumed running when the Louisiana Supreme Court denied petitioner's collateral-review writ application, because a petitioner receives no additional tolling credit for the period during which he could have sought review by the United States Supreme Court with respect to the denial of post-conviction relief. Lawrence v. Florida, 549 U.S. 327, 332 (2007); Ott v. Johnson, 192 F.3d 510, 512-13 (5th Cir. 1999).

The Court must next consider equitable tolling. The United States Supreme Court has expressly held that the AEDPA's statute of limitations is subject to equitable tolling. Holland v. Florida, 560 U.S. 631, 645 (2010). However, "equitable tolling is unavailable in most cases …." Miles v. Prunty, 187 F.3d 1104, 1107 (9th Cir. 1999); accord Davis v. Johnson, 158 F.3d 806, 811 (5th Cir. 1998) (holding that the AEDPA's statute of limitations can be equitably tolled "in rare and exceptional circumstances"). Indeed, the Supreme Court held that "a petitioner is entitled to equitable tolling only if he shows both that (1) he has been pursuing his rights diligently, and (2) some extraordinary circumstance stood in his way and prevented timely filing." Holland, 560 U.S. at 649 (internal quotation marks omitted). A petitioner bears the burden of proof to establish entitlement to equitable tolling. Alexander v. Cockrell, 294 F.3d 626, 629 (5th Cir. 2002). In the instant case, petitioner has brought forth no evidence whatsoever demonstrating that he is entitled to such tolling, and this Court knows of no reason that would support equitable tolling of the statute of limitations.

Finally, the Court notes that a petitioner can overcome the AEDPA's statute of limitations by making a convincing claim of "actual innocence" under McQuiggin v. Perkins, 569 U.S. 383 (2013). In Perkins, the United States Supreme Court held:

> This case concerns the "actual innocence" gateway to federal habeas review applied in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), and further explained in House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006). In those cases, a convincing showing of actual innocence enabled habeas petitioners to overcome a procedural bar to consideration of the merits of their constitutional claims. Here, the question arises in the context of 28 U.S.C. § 2244(d)(1), the statute of limitations on federal habeas petitions prescribed in the Antiterrorism and Effective Death Penalty Act of 1996. Specifically, ... can the time bar be overcome by a convincing showing that [the petitioner] committed no crime?
> We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in

5

> Schlup and House, or, as in this case, expiration of the statute of limitations. We caution, however, that tenable actual-innocence gateway pleas are rare: "[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Schlup, 513 U.S., at 329, 115 S.Ct. 851; see House, 547 U.S., at 538, 126 S.Ct. 2064 (emphasizing that the Schlup standard is "demanding" and seldom met).

Perkins, 569 U.S. at 386.

In the instant case, petitioner has not invoked Perkins.[18] Nevertheless, in the event he changes his mind and argues in any objections to this Report and Recommendation that he does, in fact, fall within Perkins, the Court should reject any such argument for the following reasons.

In assessing a claim of actual innocence, a court normally first examines the evidence presented at trial and on which the petitioner's conviction was based. See, e.g., Johnson v. Cain, Civ. Action No. 14-543, 2015 WL 4528889, at *3 (E.D. La. July 27, 2015), aff'd, 667 F. App'x 474 (5th Cir. 2016); Lyles v. Tanner, Civ. Action No. 13-655, 2014 WL 4674673, at *6 (E.D. La. Sept. 17, 2014). In the instant case, petitioner's conviction was based on his actions in leaving a party on May 4, 2013. On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the evidence regarding the crime as follows:

> Mr. Ancalade was convicted of one count of discharging a firearm during a violent crime pursuant to Louisiana Revised Statute 14:94(A). This statute provides that the "[i]llegal use of weapons or dangerous instrumentalities is the intentional or criminally negligent discharging of any firearm ... where it is foreseeable that it may result in death or great bodily harm to a human being." Subsection F adds enhanced penalties when the person committing the crime of illegal use of weapons does so "while committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit a crime of violence."
> … At trial, every eyewitness testified that on the evening of May 4, 2013, they observed Mr. Ancalade fire gunshots in their direction. …

---

[18] On the contrary, he expressly stated that he "does not claim actual innocence and has not presented any, 'new evidence' which has not been considered by the jury who found him guilty at trial." Rec. Doc. 14, p. 3.

6

Mr. Schmiderder, the party host, testified at trial that as Crystal [Schmiderder] and Mr. Ancalade were leaving the party in a car which Mr. Ancalade was driving. Mr. Schmiderder waved to Mr. Ancalade, which prompted Mr. Ancalade to back up and ask Mr. Schmiderder what he had said. Mr. Schmiderder testified that as he approached the driver's window, Mr. Ancalade grabbed him by the tie, pulled him against the car, and began choking him. Mr. Schmiderder stated that during this altercation, he witnessed Mr. Ancalade hit Crystal. Mr. Ancalade then drove off and made a right turn onto a side street. Mr. Schmiderder stated that seconds after they drove off, he heard three or four gunshots. He saw Mr. Ancalade, on foot, at the corner, firing several shots at the Schmiderder family members and guests who were gathered outside of his residence.

Mr. John Behre, who lived in the same neighborhood as Mr. Schmiderder, testified that he had returned home after attending the Schmiderders' party. He was sitting on his back steps listening to music when he saw Mr. Ancalade get out of his car and begin hitting Crystal. Mr. Behre testified that he told Mr. Ancalade to stop hitting her. The two men exchanged words. Mr. Behre testified that Mr. Ancalade grabbed a revolver-style gun from under the driver's seat of the car and fired a shot at him. Mr. Behre began running away from Mr. Ancalade, who fired four or five more rounds. Mr. Behre stated that he called 911, but no police officers came to the scene. He went to the police station two days later to give his statement.

Ms. Jaclin Behre, Mr. Behre's sister, corroborated her brother's testimony concerning the incident. Ms. Behre testified that around 8:00 p.m., she was at the corner near her house when she saw Mr. Ancalade point a gun at her brother. Mr. Ancalade initially fired two shots at her brother and then fired three more shots as her brother ran away from the scene. Ms. Behre stated that she hid under her house because she was in fear for her life.

Ms. Lorelei Schmiderder Augustine, Crystal's sister, testified that after she left the party, she received a phone call from her sister, Ms. Teresa Schmiderder, who was still at the party. Ms. Augustine testified that she did not have a conversation with Teresa at that time, but heard screaming and four gunshots before the line went dead. Ms. Augustine called 911 and returned to her father's house. She stated that the police did not arrive that evening. Two days later, she went to the police station to report the incident.

Ms. Teresa Schmiderder, Crystal's sister, testified that she was at the party when Crystal and Mr. Ancalade left. As they drove away, Mr. Ancalade got into an altercation with Mr. Schmiderder, in which Mr. Ancalade grabbed Mr. Schmiderder and began choking him. Teresa testified that as Crystal tried to restrain Mr. Ancalade, he hit her. Mr. Ancalade and Mr. Schmiderder were eventually separated and Mr. Ancalade drove away from the house. A few minutes later, Teresa stated that she heard gunshots. She then saw Mr. Ancalade standing in the street shooting in the direction of her and her family. She testified that as he fired the weapon, he advanced a few steps in their direction. Two days after the incident, she went to the police station with other witnesses to report it.

During cross-examination, Teresa testified that Mr. Ancalade had gotten physical with her in the past. She filed a police report, but, fearing for Crystal's safety, she dropped the charges.

Ms. Carmelite Sievers, Crystal's cousin, corroborated Teresa's testimony. Ms. Sievers added that her husband was able to free her uncle from Mr. Ancalade's grasp. After the shooting incident, she called 911, but the police did not respond at the scene that night. Two days later, she gave a written statement to police officers identifying Mr. Ancalade as the person who fired shots at her and her family.

Ms. Jeannette Schmiderder, another of Crystal's sisters, testified that Mr. Ancalade was Crystal's boyfriend of some years. Jeannette also attended the party on May 4, 2013. Jeannette testified that she witnessed the altercation between Mr. Schmiderder and Mr. Ancalade. After the altercation, she began gathering her belongings to leave when she heard several gunshots and saw Mr. Ancalade approaching on foot shooting at them. She called 911 and gave a statement to police, identifying Mr. Ancalade as the shooter.

Ms. Shelly Perschall was also called as a witness by the State. She stated that she was friends with the Schmiderders and attended their party on May 4, 2013. She recalled that she left the party around 8:00 p.m. and stopped for gas. While she was at the gas station, she received a call from Jeannette telling her about an altercation between Mr. Schmiderder and Mr. Ancalade. Ms. Perschall returned to the Schmiderder residence about two minutes later. As she did, she saw Mr. Ancalade standing in the street firing a gun. Ms. Perschall fled the scene and called 911.

New Orleans Police Department Detective Gregory Powell of the Violent Crime Division testified that he met with five or six people on May 6, 2013, concerning this incident. Det. Powell learned from the police dispatch that several 911 calls were received on May 4, 2013; however, for unknown reasons, no police unit responded. Upon learning Mr. Ancalade's identity, Det. Powell obtained an arrest warrant for Mr. Ancalade for the crimes of aggravated assault and illegal discharge of a firearm. Det. Powell did not personally inspect the scene, but testified that a NOPD Officer Parker did inspect the scene, but did not recover any evidence. On re-direct, Det. Powell opined that if a revolver was used in the shooting, it would not be unusual not to find casings because a revolver does not eject casings.

Ms. Crystal Schmiderder testified on behalf of the defendant. She said that the defendant was her fiancée, that they had been together since she was twelve years old, and that they have three children together. She denied that Mr. Ancalade had ever beaten her. She testified that her family's relationship with Mr. Ancalade was not good, that they never liked him, and that they constantly tried to convince her to leave him.

Crystal recalled that she and Mr. Ancalade attended the party on May 3 [sic], 2013. Mr. Ancalade had not been drinking. She testified that the altercation between Mr. Ancalade and her father was due to her father's drinking and resulting bad temper. As she and Mr. Ancalade were leaving the party, her father yelled

something to them. She asked Mr. Ancalade to back up so she could find out what her father wanted. Mr. Ancalade asked her father was he had said. To which her father responded, "I didn't f---ing say nothing to you. Ain't nobody f---ing talking about you." Crystal testified that her father reached into the vehicle and grabbed Mr. Ancalade's shirt. She told Mr. Ancalade to drive away and tried to roll the window up. During the altercation, Mr. Ancalade's shirt was torn and his necklace was broken.

       Crystal testified that they drove around the corner and parked the car. Mr. Ancalade attempted to comfort her. While they were sitting in the parked car, Crystal stated that she saw two men approaching. The men were removing their shirts and saying something about beating Mr. Ancalade. In response, Mr. Ancalade grabbed Crystal's gun, exited the car, and fired two or three shots, telling the men that he did not want any trouble. Mr. Ancalade got back into the car, and they drove away. Crystal denied that Mr. Ancalade walked to the corner and began firing at her family. On cross-examination, Crystal said that she recognized one of the men who approached them as John Behre.

       The State re-called Teresa Schmiderder on rebuttal. Teresa recounted a specific occasion when Crystal called her because Mr. Ancalade was beating her and she needed help. Teresa went to Crystal's home in an attempt to help her. Teresa testified that when she arrived at the house, Mr. Ancalade hit her. Teresa reported this incident to the police and told the officer that Crystal would deny that Mr. Ancalade was beating her. Teresa testified that Mr. Ancalade had given Crystal a black eye during one of their fights and had witnessed Mr. Ancalade hit Crystal on occasion.

       It is clear from the record that every eyewitness, including Mr. Ancalade's girlfriend, saw him fire a weapon.[19]

If petitioner were now to allege that he is actually innocent of the crime of which he stands convicted, he must support his allegations "with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." Schlup v. Delo, 513 U.S. 298, 324 (1995). "Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful." Id. It certainly cannot be successful in cases such as this one, where the petitioner has not submitted *any* new evidence whatsoever to show that he is actually innocent and, indeed, expressly stated that he

---

[19] State v. Ancalade, 158 So. 3d 891, 894-96 (La. App. 4th Cir. 2015); State Rec., Vol. 2 of 5.

9

"does not claim actual innocence and has not presented any, 'new evidence' which has not been considered by the jury who found him guilty at trial." Rec. Doc. 14, p. 3.

Because petitioner is not entitled to further statutory tolling, and because he has not established that he is eligible for equitable tolling or that he is actually innocent, his federal application for habeas corpus relief had to be filed no later than **February 7, 2019**, in order to be timely. Because petitioner's application was not filed until **July 2, 2019**,[20] it was untimely.

## RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Roger Ancalade be **DISMISSED WITH PREJUDICE** as untimely filed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this twenty-third day of October, 2020.

_____
**JANIS VAN MEERVELD**
**UNITED STATES MAGISTRATE JUDGE**

---

[20] "A prisoner's habeas application is considered 'filed' when delivered to the prison authorities for mailing to the district court." Roberts v. Cockrell, 319 F.3d 690, 691 n.2 (5th Cir. 2003). Petitioner has declared under penalty of perjury that his application was placed in the prison mailing system on July 2, 2019. Rec. Doc. 1, p. 15.